AO 106 (Rev. 04/010) Application for Search Warrant                AUTHORIZED AND APPROVED/DATE:    BH 5/10/2024

# UNITED STATES DISTRICT COURT
for the

WESTERN _____ DISTRICT OF _____ OKLAHOMA

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| Maher ████████ and his luggage | ) | Case No: MJ-24-421-STE |
| Eltarhoni | ) | |

## APPLICATION FOR SEARCH WARRANT

I, a federal law enforcement officer or attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following property:

See Attachment A, which is attached and incorporated by reference.

Located in the Western District of Oklahoma, there is now concealed:

See Attachment B, which is attached and incorporated by reference.

The basis for the search under Fed. R. Crim.P.41(c) is (check one or more):

☒ evidence of the crime;
☐ contraband, fruits of crime, or other items illegally possessed;
☐ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 2252A(a)(5)(B) | Possession of Child Pornography |

The application is based on these facts:

See attached Affidavit of Special Agent Andrea Salazar, Homeland Security, which is incorporated by reference herein.

☒ Continued on the attached sheet(s).
☐ Delayed notice of _____ days (give exact ending date if more than 30 days) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet(s).

*Applicant's signature*

Andrea Salazar
Special Agent
Homeland Security

Sworn to before me and signed in my presence.

Date: **May 10, 2024**

*Judge's signature*

City and State: Oklahoma City, Oklahoma

SHON T. ERWIN  U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Special Agent Andrea Salazar, being first duly sworn, state as follows:

### INTRODUCTION

1.      I am currently employed as a Special Agent ("SA") with Homeland Security Investigations ("HSI") and have been so since July 2022. Prior, I was a federal police officer with Pentagon Force Protection Agency and had been so employed since August 2019. I hold a bachelor's degree in criminology and a Master of Public Administration from St. Mary's University. I also hold a Master of Science in Criminal Justice from Sam Houston State University.

2.      I am currently assigned to HSI Office of the Resident Agent in Charge Oklahoma City, Oklahoma. As part of my various duties and responsibilities, I investigate federal criminal cybercrime violations. As it relates to cybercrime, I have gained experience conducting child exploitation and child pornography investigations. My working experience has been augmented by training I received at the Federal Law Enforcement Training Center. Moreover, I have access to the institutional knowledge developed around this type of investigation by working with other experienced child exploitation criminal investigators. I have become aware of numerous examples of child pornography. Additionally, I have had the opportunity to observe and review hundreds of images and videos of child pornography (as defined in 18 U.S.C. § 2256) in all forms of media, including computer media. Moreover, I am a federal law enforcement officer who is engaged in enforcing criminal laws, including 18 U.S.C. § 2252 and 2252A, and I am authorized by law to request a search warrant.

3.      I am investigating the online activities of Maher ELTARHONI. As explained herein, there is probable cause to believe ELTARHONI possessed child pornography in violation of 18 U.S.C. § 2252A(a)(5)(B).

4.    This Affidavit seeks authorization to search ELTARHONI's person and in his possession for electronic devices that I have probable cause to believe that has child pornography, as further described in Attachment A (the "the **SUBJECT INDIVIDUAL**"), and seize the items described in Attachment B, which constitute instrumentalities, fruits, and evidence of the aforementioned crimes.

5.    The facts set forth in this Affidavit are based upon my personal observations and training, prior investigations and, where noted, information related to me by other law enforcement officers. Since this Affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to support the issuance of a search warrant.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

6.    Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on devices. This information can sometimes be recovered with forensics tools.

7.    I know that cellular telephones are often equipped with digital cameras and those phones possess the capability to transmit and/or store electronic images. I know that in many cases, cellular telephones maintain photographs of illegal activities. These photos are sometimes stored in cellular phones and often are transmitted or sent from one electronic media device to another. I also know that cellular phones may contain notes regarding potential illegal acts that are recorded by the subject who possesses the electronics. Furthermore, I know that text messages and emails are often used by two or more persons to communicate information regarding illegal activities,

between principals and co-conspirators of those crimes.

8.    I know that cellular telephones are utilized by the majority of individuals in the United States and have become a staple of communication between individuals using text messaging, visual and audible communications, as well as applications like Instagram. Additionally, individuals utilize their cellular devices to take and store pictures and keep notes. Communications on phones are kept for long periods and transferred from one phone to another when replaced. This is done through the use of Cloud storage and direct transfer conducted at the time of purchase or by the individual themselves. Individuals utilize this method as not to lose data that is stored on the phone such as contacts, photos, notes, and other important information to the individual.

9.    Cellular telephones are often used to facilitate offenses and allow criminals to maintain communication with each other before, during, and after the commission of offenses. I am aware that cellular telephones have the capacity to store a vast amount of information, including but not limited to: telephone numbers, voice messages, text messages, e-mail, photographs, videos, address books, records, phone call histories, contact and other information.

10.    *Forensic evidence*. As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the aforementioned crimes, but also forensic evidence that establishes how the subject's devices was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the **SUBJECT INDIVIDUAL** because:

    a.    Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

11.    *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the **SUBJECT INDIVIDUAL** and baggage in his possession consistent with the warrant. The examination may require authorities to employ techniques (including but not limited to computer-assisted scans of the entire medium) that might expose many parts of the **SUBJECT INDIVDUAL** to human inspection in order to determine whether it is evidence described by the warrant.

**TECHNICAL TERMS**

12.    Based on my training and experience, I use the following technical terms to convey the following meanings:

a.    "Computer" refers to any electronic, magnetic, optical, electrochemical, or other high-speed data processing device capable of performing logical or storage functions and includes any data storage facility or communications facility directly related to such a device. As used herein, "computer" also incorporates digital devices that complete these same functions, such as smartphones, tablets, connected devices, and e-readers. *See* 18 U.S.C. § 1030(e)(1).

b.    Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

c.  Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

d.  Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

e.  GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records of the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical

representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

f.  Tablet: A tablet is a mobile computer, typically larger than a phone yet smaller than a notebook, that is primarily operated by touching the screen. Tablets function as wireless communication devices and can be used to access the Internet through cellular networks, 802.11 "wi-fi" networks, or otherwise. Tablets typically contain programs called apps, which, like programs on a personal computer, perform different functions and save data associated with those functions. Apps can, for example, permit accessing the Web, sending and receiving e-mail, and participating in Internet social networks.

g.  IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

h.  Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections

between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

13.     Based on my training, experience, and research, I believe that the subject's devices has capabilities that allow it to serve as a wireless telephone, computer, digital camera, portable media player, GPS navigation device, and tablet. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## BACKGROUND ON CHILD PORNOGRAPHY, COMPUTERS, THE INTERNET, AND EMAIL

14.     I have had both training and experience in the investigation of computer-related crimes. Based on my training, experience, and knowledge, I know the following:

   a)  Computers and digital technology have dramatically changed the way in which individuals interested in child pornography interact with each other. Computers basically serve four (4) functions in connection with child pornography: production, communication, distribution, and storage.

   b)  Child pornographers can now transfer printed photographs into a computer-readable format with a device known as a scanner. Furthermore, with the advent of digital cameras and smartphones with cameras, when the photograph is taken it is saved as a digital file that can be directly transferred to a computer by simply connecting the camera or smartphone to the computer. In the last ten (10) years, the resolution of pictures taken by digital cameras and smartphones

has increased dramatically, meaning that such pictures have become sharper and crisper. Photographs taken on a digital camera or smartphone may be stored on a removable memory card in the camera or smartphone. These memory cards often store up to 32 gigabytes of data or more, which provides enough space to store thousands of high-resolution photographs. Video camcorders, which once recorded video onto tapes or mini-CDs, now can save video footage in a digital format directly to a hard drive in the camera. The video files can be easily transferred from the camcorder to a computer.

c)   A device known as a modem allows any computer to connect to another computer through the use of telephone, cable, or wireless connection. Electronic contact can be made to literally millions of computers around the world. The ability to produce child pornography easily, reproduce it inexpensively, and market it anonymously (through electronic communications) has drastically changed the method of distribution and receipt of child pornography. Child pornography can be transferred via electronic mail or through file transfer protocols (FTPs) to anyone with access to a computer and modem. Because of the proliferation of commercial services that provide electronic mail service, chat services (*i.e.*, "instant messaging"), and easy access to the Internet, the computer is a preferred method of distribution and receipt of child pornographic materials.

d)   The computer's ability to store images in digital form makes the computer itself an ideal repository for child pornography. The size of the electronic storage media (commonly referred to as the hard drive) used in home computers has

grown tremendously within the last several years. These drives can store thousands of images at very high resolution. In addition, there are numerous options available for the storage of computer or digital files. One-terabyte or larger external and internal hard drives are not uncommon. Other media storage devices include CDs, DVDs, and "thumb," "jump," or "flash" drives, which are very small devices which are plugged into a port on the computer. It is extremely easy for an individual to take a photo or a video with a digital camera or camera-bearing smartphone, upload that photo or video to a computer, and then copy it (or any other files on the computer) to any one of those media storage devices (CDs and DVDs are unique in that special software must be used to save or "burn" files onto them). Some media storage devices can easily be concealed and carried on an individual's person. Smartphones and/or mobile phones are also often carried on an individual's person.

e)  The Internet affords individuals several different venues for obtaining, viewing, and trading child pornography in a relatively secure and anonymous fashion.

f)  Individuals also use online resources to retrieve and store child pornography, including services offered by Internet Portals such as Yahoo! and Hotmail, among others. The online services allow a user to set up an account with a remote computing service that provides e-mail services as well as electronic storage of computer files in any variety of formats. A user can set up an online storage account from any computer with access to the Internet. Even in cases

where online storage is used, however, evidence of child pornography can be found on the user's computer or external media in most cases.

g) As is the case with most digital technology, communications by way of computer can be saved or stored on the computer used for these purposes. Storing this information can be intentional (*i.e.*, by saving an e-mail as a file on the computer or saving the location of one's favorite websites in, for example, "bookmarked" files). Digital information can also be retained unintentionally such as the traces of the path of an electronic communication may be automatically stored in many places (*e.g.*, temporary files or ISP client software, among others). In addition to electronic communications, a computer user's Internet activities generally leave traces or "footprints" in the web cache and history files of the browser used. Such information is often maintained indefinitely until overwritten by other data.

h) I know Google Drive is an internet-based cloud-storage service that enables users to download the Google Drive app to their laptop or smartphone and upload documents, videos, picture-files, etc., from their laptop or smartphone to Google Drive for storage. Users can simultaneously store such files on both their Google Drive account as well as their laptop or smartphone. I know that computer forensic examiners can detect evidence of the laptop or smartphone user's use of the service.

## SPECIFICS OF SEARCH AND SEIZURE OF COMPUTER SYSTEMS

15. Based upon my training and experience, and information relayed to me by agents and others involved in the forensic examination of computers, I know that computer data can be

stored on a variety of systems and storage devices, including external and internal hard drives, flash drives, thumb drives, micro SD cards, macro SD cards, DVDs, gaming systems, SIM cards, cellular phones capable of storage, floppy disks, compact disks, magnetic tapes, memory cards, memory chips, and online or offsite storage servers maintained by corporations, including but not limited to "cloud" storage. I also know that during the search of the premises it is not always possible to search computer equipment and storage devices for data for a number of reasons, including the following:

a)  Searching computer systems is a highly technical process which requires specific expertise and specialized equipment. There are so many types of computer hardware and software in use today that it is impossible to bring to the search site all of the technical manuals and specialized equipment necessary to conduct a thorough search. In addition, it may also be necessary to consult with computer personnel who have specific expertise in the type of computer, software application, or operating system that is being searched;

b)  Searching computer systems requires the use of precise, scientific procedures which are designed to maintain the integrity of the evidence and to recover "hidden," erased, compressed, encrypted, or password-protected data. Computer hardware and storage devices may contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Since computer data is particularly vulnerable to inadvertent or intentional modification or destruction, a controlled environment, such as a law enforcement laboratory, is essential to conducting a complete and accurate analysis of the equipment and storage devices from which the data will be extracted;

c) The volume of data stored on many computer systems and storage devices will typically be so large that it will be highly impractical to search for data during the execution of the physical search of the premises; and

d) Computer users can attempt to conceal data within computer equipment and storage devices through a number of methods, including the use of innocuous or misleading filenames and extensions. For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text. Computer users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form. In addition, computer users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography." For example, by using steganography a computer user can conceal text in an image file which cannot be viewed when the image file is opened. Therefore, a substantial amount of time is necessary to extract and sort through data that is concealed or encrypted to determine whether it is contraband, evidence, fruits, or instrumentalities of a crime.

16.    Based on my own experience and my consultation with other agents who have been involved in computer searches, searching computerized information for contraband, evidence, fruits, or instrumentalities of a crime often requires the seizure of all of a computer system's input and output peripheral devices, related software, documentation, and data security devices (including passwords), so that a qualified computer expert can accurately retrieve the system's data

in a laboratory or other controlled environment. There are several reasons that compel this conclusion:

a) The peripheral devices that allow users to enter or retrieve data from the storage devices vary widely in their compatibility with other hardware and software. Many system storage devices require particular input/output devices in order to read the data on the system. It is important that the analyst be able to properly re-configure the system as it now operates in order to accurately retrieve the evidence listed above. In addition, the analyst needs the relevant system software (operating systems, interfaces, and hardware drivers) and any applications software which may have been used to create the data (whether stored on hard drives or on external media), as well as all related instruction manuals or other documentation and data security devices; and

b) In order to fully retrieve data from a computer system, the analyst also needs all magnetic storage devices, as well as the central processing unit (CPU). Further, the analyst needs all the system software (operating systems or interfaces, and hardware drivers) and any applications software that may have been used to create the data (whether stored on hard drives or on external media) for proper data retrieval.

17.    Additionally, based upon my training and experience and information related to me by agents and others involved in the forensic examination of computers, I know that routers, modems, and network equipment used to connect computers to the Internet often provide valuable evidence of, and are instrumentalities of, a crime. This is equally true of so-called "wireless routers," which create localized networks that allow individuals to connect to the Internet

wirelessly. Though wireless networks may be "secured" (in that they require an individual to enter an alphanumeric key or password before gaining access to the network) or "unsecured" (in that an individual may access the wireless network without a key or password), wireless routers for both secured and unsecured wireless networks may yield significant evidence of, or serve as instrumentalities of, a crime—including, for example, serving as the instrument through which the perpetrator of the Internet-based crime connected to the Internet and, potentially, containing logging information regarding the time and date of a perpetrator's network activity as well as identifying information for the specific device(s) the perpetrator used to access the network. Moreover, I know that individuals who have set up either a secured or unsecured wireless network in their residence are often among the primary users of that wireless network.

18.    Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am seeking would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all the evidence described in the warrant and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques including, but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection to determine whether it is evidence described by the warrant.

## **PROBABLE CAUSE**

19.    On January 23, 2024, HSI Oklahoma City received information from the Oklahoma State Bureau of Investigations (OSBI) regarding a Cyber Tip Line Report 184951099 from the National Center For Missing and Exploited Children (NCMEC). The electronic service provider (ESP) Google LLC reported content containing child exploitation material in a Google Drive infrastructure. The suspect's email address is rim.tarhuni@gmail.com and/or

**meltarhoni@gmail.com**, screen/user name is Rim Tarhuni, with a mobile phone number +14053321326 (verified 06/07/2020 21:28:32 UTC). The IP address provided on the report was 70.174.239.47. The Cyber Tip Report 184951099 reported the ISP as Cox Communications.

20.     On January 26, 2024, HSI Oklahoma City received information from the OSBI regarding an additional Cyber Tip Line Report 185070213 from the National Center For Missing and Exploited Children (NCMEC). The ESP Google LLC reported content containing child exploitation material in a Google Drive infrastructure. The suspect's email address is rim.tarhuni@gmail.com and/or meltarhoni@gmail.com, screen/user name is Rim Tarhuni, with a mobile phone number +140533211326 (verified 06/07/2020 21:28:32 UTC). The IP address provided on the report was 70.174.239.47. The Cyber Tip Report 184951099 reported the ISP as Cox Communications.

21.     On February 1, 2024, I submitted a subpoena to Cox Communications for data related to IP address 70.174.239.47. The response was provided on February 15, 2023. The account related to the IP address was registered to a **Maher ELTARHONI (the SUBJECT INDIVIDUAL)**. The subscriber information for the account was Maher ELTARHONI, at 7500 NW 149th Cir, Oklahoma City, OK 73142-7805. The telephone number listed for the subscriber information was 405-332-1326 and an email address of maher.eltarhoni@okstate.edu. The account start date is listed as July 3, 2019.

22.     On February 6, 2024, through the utilization of a law enforcement database, it was determined that **the SUBJECT INDIVIDUAL** entered the United States on July 15, 2009, through the issuance of an F-1 visa, an academic status to enter the United States. **the SUBJECT INDIVIDUAL** is originally from Libya. **the SUBJECT INDIVIDUAL** married Cristina Garcia on July 9, 2012. On January 23, 2013, Cristina Garcia petitioned for **the**

**SUBJECT INDIVIDUAL** to become a United States Citizen. January 14, 2015, **the SUBJECT INDIVIDUAL** was approved for an I-485, an application to Register Permanent Residence or Adjust Status, and became a naturalize citizen on July 12, 2017. **The SUBJECT INDIVIDUAL** divorced Cristina Garcia on January 31, 2018. **the SUBJECT INDIVIDUAL** then married Dang Hong Tran Ngoc on October 7, 2018.

23.     On February 7, 2024, through the utilization of a law enforcement database, it was determined that **the SUBJECT INDIVIDUAL** has a 2021 Nissan Rogue, Oklahoma license plate NHE120, registered in his name.

24.     On February 15, 2024, after receiving the information from Cox Communications, I checked the Oklahoma County Assessor's Office public records and discovered the deed to the subject's premises was granted to **the SUBJECT INDIVIDUAL** and Dang Hong Tran Ngoc on December 20, 2023.

25.     On February 20, 2024, Google Legal Investigations Support confirmed the formal request for the preservation of records and other evidence pursuant to 18 U.S.C. 2703(f) pending further legal process for **the SUBJECT INDIVIDUAL's** Google accounts rim.tarhuni@gmail.com and meltarhoni@gmail.com

26.     On March 21, 2024, I reviewed the material received by National Center for Missing and Exploited Children (NCMEC). Previously mentioned Cyber Tip 184951099: Google LLC. reported that 15 files were uploaded to the suspect's Google Drive account on January 19, 2024, at 12:20:05 UTC. I reviewed three of the files. One file showed a video depicting a pubescent female showing her vagina. Another video showed three pubescent children, one female and two males engaging in sexual intercourse and exposing of genitalia

area. A third file that was uploaded showed a video of two prepubescent females showering together and exposing their vagina.

27.    Previously mentioned Cyber Tip 185070213: Google LLC. reported that two files were uploaded to the suspect's Google Drive account on January 19, 2024, at 04:18:03 UTC. I reviewed the files. One file showed three prepubescent minors, one female and two males, engaging in sexual intercourse and exposing of genitalia area. The second file depicted two prepubescent females completely naked, exposing their vaginas and engaged in sexually explicit conduct

28.    On April 11, 2024, United States Postal Inspection Service (USPIS) confirmed that The Hefner Station letter carrier stated he delivers mail to **the SUBJECT INDIVIDUAL** at:  7500 NW 149th Cir OKC 73142. The Yukon Post Office stated there is a forwarding order from 11616 SW 7th St **to** 7500 NW 149th Cir OKC 73142, effective January 1, 2024, in the name of Maher Eltarhoni and Elta Design Company.

29.    On May 9, 2024, Homeland Security Investigations conducted a federal residential warrant at 7500 NW 149th Street, Oklahoma City, 73142. At the time of execution, a male subject was encountered inside the residence and later identified as Fares Saleh Tarhuni. Fares.  He stated that the residence belonged to his brother, **the SUBJECT INDIVIDUAL**, and his wife. Fares also stated that **the SUBJECT INDIVIDUAL**, his wife, and their two-year-old daughter live at the residence as well but left on the evening of May 8, 2024, to Colorado for a family vacation. Fares Tarhuni stated that his brother will be returning to Oklahoma City via Southwest through William Rogers Airport on May 11, 2024. Fares Tarhuni stated his brother has an iPhone in his possession.

30.     During the search of the residence, a Samsung tablet docking station was discovered in the residence, but no Samsung tablet was discovered. We have reason to believe that **the SUBJECT INDIVIDUAL** has the tablet (as well as a cell phone) in his possession, on his person or in his luggage, on his trip.

31.     I know when people travel they typically have luggage with them to include, backpacks, purses, and/or luggage. I also know that people tend to place their electronic devices in those storage items.

### CHARACTERISTICS COMMON TO INDIVIDUALS WHO POSSESS AND/OR ATTEMPT TO VIEW CHILD PORNOGRAPHY

32.     Based on my previous investigative experience related to child exploitation investigations, and the training and experience of other law enforcement officers with whom I have had discussions, I know there are certain characteristics common to individuals who possess and/or attempt to view child pornography:

    a)   Such individuals often receive sexual gratification, stimulation, and satisfaction from contact with children, or from fantasies they may have viewing children engaged in sexual activity or in sexually suggestive poses, such as in person, in photographs, or other visual media, or from literature describing such activity.

    b)   Such individuals may collect sexually explicit or suggestive materials in a variety of media, including photographs, magazines, motion pictures, videotapes, books, slides and/or drawings or other visual media. Individuals who have a sexual interest in children or images of children oftentimes use these materials for their own sexual arousal and gratification. Further, they may use these materials to lower the inhibitions of children they are attempting to

seduce, to arouse the selected child partner, or to demonstrate the desired sexual acts.

c) Such individuals may possess and maintain their hard copies of child pornographic material, that is, their pictures, films, video tapes, magazines, negatives, photographs, correspondence, mailing lists, books, tape recordings, etc., in the privacy and security of their home or some other secure location. Individuals who have a sexual interest in children or images of children often retain pictures, films, photographs, negatives, magazines, correspondence, books, tape recordings, mailing lists, child erotica, and videotapes for many years.

d) Likewise, such individuals often maintain their child pornography images in a digital or electronic format in a safe, secure and private environment, such as a computer and surrounding area. These child pornography images are often maintained for several years and are kept close by, usually at the possessor's residence, inside the possessor's vehicle, or, at times, on their person, to enable the individual to view the child pornography images, which are valued highly. Some of these individuals also have been found to download, view, and then delete child pornography on their computers or digital devices on a cyclical and repetitive basis.

e) Importantly, evidence of such activity, including deleted child pornography, often can be located on these individuals' computers and digital devices through the use of forensic tools. Indeed, the very nature of electronic storage means that evidence of the crime is often still discoverable for extended periods of

time even after the individual "deleted" it.[1]

f)  Such individuals also may correspond with and/or meet others to share information and materials, rarely completely destroy correspondence from other child pornography distributors/possessors, conceal such correspondence as they do their sexually explicit material, and often maintain lists of names, addresses, telephone numbers, and usernames of individuals with whom they have been in contact and who share the same interests in child pornography.

g)  Such individuals prefer not to be without their child pornography for any prolonged time period. This behavior has been documented by law enforcement officers involved in the investigation of child pornography throughout the world. Thus, even if **the SUBJECT INDIVIDUAL** or other co-conspirators use a portable device (such as a mobile phone) to access the Internet and child pornography, it is more likely than not that evidence of this access will be found on his person or in his baggage as set forth in Attachment A.

## BIOMETRIC ACCESS TO DEVICES

33.  This warrant permits law enforcement to compel **the SUBJECT INDIVIDUAL** to unlock any devices requiring biometric access subject to seizure pursuant to this warrant. The grounds for this request are as follows:

a)  I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices and laptops, offer their

users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners, facial recognition features and iris recognition features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

b)  If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints. For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device. The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

c)  If a device is equipped with a facial-recognition feature, a user may enable the ability to unlock the device through his or her face. For example, this feature is available on certain Android devices and is called "Trusted Face." During the Trusted Face registration process, the user holds the device in front of his or her face. The device's front-facing camera then analyzes and records data based on the user's facial characteristics. The device can then be unlocked if the front-facing camera detects a face with characteristics that match those of the registered face. Facial recognition features found on devices produced by

other manufacturers have different names but operate similarly to Trusted
Face.

d) If a device is equipped with an iris-recognition feature, a user may enable the
ability to unlock the device with his or her irises. For example, on certain
Microsoft devices, this feature is called "Windows Hello." During the
Windows Hello registration, a user registers his or her irises by holding the
device in front of his or her face. The device then directs an infrared light
toward the user's face and activates an infrared-sensitive camera to record data
based on patterns within the user's irises. The device can then be unlocked if
the infrared-sensitive camera detects the registered irises. Iris-recognition
features found on devices produced by other manufacturers have different
names but operate similarly to Windows Hello.

e) In my training and experience, users of electronic devices often enable the
aforementioned biometric features because they are considered to be a more
convenient way to unlock a device than by entering a numeric or alphanumeric
passcode or password. Moreover, in some instances, biometric features are
considered to be a more secure way to protect a device's contents. This is
particularly true when the users of a device are engaged in criminal activities
and thus have a heightened concern about securing the contents of a device.

f) As discussed in this Affidavit, I have reason to believe that one or more digital
devices will be found during the search. The passcode or password that would
unlock the devices subject to search under this warrant currently is not known
to law enforcement. Thus, law enforcement personnel may not otherwise be

able to access the data contained within the devices, making the use of biometric features necessary to the execution of the search authorized by this warrant.

g)  I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled. This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period of time. For example, Apple devices cannot be unlocked using Touch ID when: (1) more than 48 hours has elapsed since the device was last unlocked; or, (2) when the device has not been unlocked using a fingerprint for 8 hours *and* the passcode or password has not been entered in the last 6 days. Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

h)  Due to the foregoing, if law enforcement personnel encounter any devices that are subject to seizure pursuant to this warrant and may be unlocked using one of the aforementioned biometric features, this warrant permits law enforcement personnel to: (1) press or swipe the fingers (including thumbs) of **the SUBJECT INDIVIDUAL** to the fingerprint scanner of the devices found on the person of **the SUBJECT INDIVIDUAL;** (2) hold the devices found on the person of **the SUBJECT INDIVIDUAL** in front of the face of **the**

**SUBJECT INDIVIDUAL** and activate the facial recognition feature; and/or (3) hold the devices found on the person of **the SUBJECT INDIVIDUAL** in front of the face of **ELTARHONI** and activate the iris recognition feature, for the purpose of attempting to unlock the devices in order to search the contents as authorized by this warrant. The proposed warrant does not authorize law enforcement to compel that **the SUBJECT INDIVIDUAL** state or otherwise provide the password or any other means that may be used to unlock or access the devices. Moreover, the proposed warrant does not authorize law enforcement to compel **the SUBJECT INDIVIDUAL** to identify the specific biometric characteristics (including the unique finger(s) or other physical features) that may be used to unlock or access the devices.

## CONCLUSION

34.     Based on the foregoing, there is probable cause to believe that the federal criminal statutes cited herein have been violated, and that the contraband, property, evidence, fruits, and instrumentalities of these offenses, more fully described in Attachment B, are on **the SUBJECT INDIVIDUAL** described in Attachment A. I respectfully request this Court issue a search warrant for **the SUBJECT INDIVIDUAL** described in Attachment A to seize the items described in Attachment B.

Andrea Salazar
Special Agent
Homeland Security Investigations

Sworn and subscribed before me this ___10th___ day of May, 2024.

SHON T. ERWIN
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A

## THE SUBJECT INDIVIDUAL TO BE SEARCHED

This warrant seeks to search Maher ELATRHONI's person and personal belongings returning with him on his flight back to Oklahoma City. I know when people travel, they typically have luggage with them to include, backpacks, purses, and/or luggage. I also know that people tend to place their electronic devices in those storage items. The person to be searched is Maher ELTARHONI. ELTARHONI date of birth is March 1, 1991. ELTARHONI is listed on his driver's license as approximately 5'8 tall and weighing about 200 pounds. ELTARHONI is described above and pictured below:



**ATTACHMENT B**

**<u>LIST OF ITEMS TO BE SEIZED</u>**

All computers, as broadly defined by 18 U.S.C. § 1030(e), including cell phones and tablets, on the person of the SUBJECT INDIVIDUAL described in Attachment A as well as in his baggage.

All records on such computers related to violations of the aforementioned offenses: possession of child pornography in violation of 18 U.S.C. § 2252A(a)(5)(B).

All:

**I.    <u>Digital Evidence</u>**

1.    Any passwords, password files, test keys, encryption codes, or other information necessary to access devices in possession of the **SUBJECT INDIVIDUAL** or in his baggage**;**

2.    All records, documents, programs, applications, or materials created, modified, or stored in any form, including in digital form, on any computer that show the actual user(s) of the computer or digital device during the time the device was used to commit the crimes referenced above, including the web browser's history; temporary Internet files; cookies, bookmarked, or favorite web pages; email addresses used from the device; MAC IDs and/or Internet Protocol addresses used by the device; email, instant messages, and other electronic communications; address books; contact lists; records of social networking and online service usage; software that would allow others to control the digital device such as viruses, Trojan horses, and other forms of malicious software; evidence of the absence of such malicious software, or of the presence or absence of security software designed to detect malicious software;

3.    Evidence that the device was attached to or used as a data storage device for some other device, or that another device was attached to the device; and

4.      Evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the computer or digital device;

## II.    Records, Documents, and Visual Depictions

5.      Any records, documents, or materials, including correspondence in support of the search warrant application in any form including Instagram, or any other social media platform;

6.      Any records, documents, or materials, including any correspondence, that involve any communication with any person that appear to be coercive in nature for the purposes of grooming or obtaining images from any person;

7.      Any records, documents, or materials, including correspondence, that pertain to possession of child pornography;

8.      All originals and copies (physical or digital) of visual depictions of minors engaged in sexually explicit conduct (i.e., child pornography), as defined in Title 18, United States Code, Section 2256;

9.      Any motion pictures or digital video clips of visual depictions of minors engaged in sexually explicit conduct, as defined in Title 18, United States Code, Section 2256; video recordings which are self-produced and pertain to sexually explicit images of minors; or video recordings of minors which may assist in the location of minor victims of child exploitation or child abuse;

10.     Any records, documents, or materials which include offers to transmit, through interstate commerce by any means (including by computer), any visual depiction of a minor engaged in sexually explicit conduct, as defined in Title 18, United States Code, Section 2256;

11.    Any records, documents, or materials relating to the production, reproduction, receipt, shipment, trade, purchase, or a transaction of any kind involving the transmission, through interstate commerce (including by computer), of any visual depiction of a minor engaged in sexually explicit conduct, as defined in Title 18, United States Code, Section 2256;

12.    Any records, documents, or materials naming or identifying minors visually depicted while engaging in sexually explicit conduct, as defined in Title 18, United States Code, Section 2256;

13.    Any records of Internet usage, including records containing screen names, usernames, and e-mail addresses, and identities assumed for the purposes of communication on the Internet on any app installed on the devices of the **SUBJECT INDIVIDUAL**;

14.    Any records, documents, or materials referring or pertaining to communications with others, whether in person, by telephone, or online, for the purpose of distributing or transporting child pornography, including chat logs, call logs, address book or contact list entries, digital images sent or received;

15.    Information or evidence of any websites visited, photographs, videos, images, reports, definitions, stories, books, music, lyrics, emails, videos, messages, and/or notes associated with child pornography or those who collect, disseminate, or trade in child pornography; and

16.    Any records, documents, materials, videos, or photographs that would allow investigators to ascertain who used the **SUBJECT INDIVIDUAL**.

As used above, the terms records, documents, programs, applications or materials includes records, documents, programs, applications or materials created, modified or stored in any form including digital or electronic form.

During the execution of the search of **the SUBJECT INDIVIDUAL** and his baggage described in Attachment A, law enforcement personnel are authorized to (1) press or swipe the fingers (including thumbs) of **the SUBJECT INDIVIDUAL** to the fingerprint scanner of the devices found on the person of **the SUBJECT INDIVIDUAL** or in his bagge; (2) hold the devices found on the person of **the SUBJECT INDIVIDUAL** or in his baggage in front of his face and activate the facial recognition feature; and/or (3) hold the devices found on the person of **the SUBJECT INDIVIDUAL** or in his baggage in front of his face and activate the iris recognition feature, for the purpose of attempting to unlock the devices in order to search the contents as authorized by this warrant.

The proposed warrant does not authorize law enforcement to compel that **the SUBJECT INDIVIDUAL** to state or otherwise provide the password or any other means that may be used to unlock or access the devices. Moreover, the proposed warrant does not authorize law enforcement to compel **the SUBJECT INDIVIDUAL** to identify the specific biometric characteristics (including the unique finger(s) or other physical features) that may be used to unlock or access the devices.